# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| MEINEKE CAR CARE CENTERS, INC. | ) | CIVIL ACTION NO. |
| and ECONO LUBE N' TUNE, INC., | ) | 3:12-cv-760 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ABOMB RESULTS, LLC, MELISSA | ) | |
| ORTIZ, ADAM REICH, and | ) | |
| MICHAEL ORTIZ. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, MEINEKE CAR CARE CENTERS, INC. ("Meineke") and ECONO LUBE N'
TUNE, INC. ("EconoLube") (together, the "Driven Companies"), together, through their
undersigned counsel, hereby sue defendants ABOMB RESULTS, LLC ("Abomb"), MELISSA
ORTIZ ("M. Ortiz"), ADAM REICH ("Reich"), and MICHAEL ORTIZ ("M.A. Ortiz")
(collectively, "Defendants") and allege and say as follows:

## INTRODUCTION

1. The Driven Companies seek to recover $513,000.00 as treble damages plus
reasonable attorneys' fees due under North Carolina's Deceptive and Unfair Trade Practices Act
(the "Act") as a result of Defendants' scheme to defraud the Driven Companies out of several
hundred thousand dollars.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter herein pursuant to 28 U.S.C.
§1332 (a) as the parties are citizens of different states and the matter in controversy exceeds the
sum or value of $75,000.00 exclusive of interest and costs.

3.     This Court has jurisdiction over the Defendants because the Driven Companies' claims arise out of promises made and conduct occurring in Charlotte, Mecklenberg County, North Carolina.

4.     This Court also has jurisdiction over the Defendants because Defendants caused an economic injury to the Driven Companies after soliciting business, entering into two written agreements, and accepting payments in Charlotte, Mecklenberg County, North Carolina.

## THE PARTIES

### *The Driven Companies*

5.     Meineke is a North Carolina corporation with its principal place of business located at 440 Church Street, Suite 700, Charlotte, North Carolina.

6.     EconoLube is a Delaware corporation with its principal place of business located at 440 Church Street, Suite 700, Charlotte, North Carolina.

### *Defendants*

7.     Abomb was formed as a New York limited liability company.  It purports that its principal place of business is located at 832 Charles Pond Drive, Coram, Suffolk County, New York.  Abomb, however, has never engaged in business.

8.     Ortiz is an individual that is a citizen of Texas residing in Austin, Travis County, Texas.

9.     Reich is an individual that is a citizen of New York residing in Coram, Suffolk County, New York.

10.    M.A. Ortiz is an individual that is a citizen of New York residing in East Northport, Suffolk County, New York.

2

## FACTS

*The Driven Companies*

11.     Meineke grants franchises to third-parties to own and operate automotive repair centers under Meineke's federally registered trade name, logos, and marks using a standard, unique, and uniform operating system.

12.     EconoLube grants franchises to third-parties to own and operate automotive repair centers under EconoLube's federally registered trade name, logos, and marks using a standard, unique, and uniform operating system.

13.     The Driven Companies operate their businesses using shared support services provided by common employees located at a centralized principal place of business located in Charlotte, North Carolina.

14.     Pursuant to this arrangement, Meineke and EconoLube identified a need in early 2012 for an employee to serve and perform duties in order to improve both companies' websites through, among other tools, search engine optimization ("SEO"). To that end, the Driven Companies created the position of Director of Interactive Media & Dealer Communications (the "SEO Director") and they solicited resumes from potential candidates.

*Defendants' Initial Relationship*

15.     M. Ortiz and M.A. Ortiz were dating and/or married in at least 2007 or 2008.

16.     Reich and M.A. Ortiz developed a friendship as a result of their involvement with professional weight lifting and/or mixed martial arts. M. Ortiz became acquainted with Reich as a result of that relationship.

17.     In approximately 2008, Reich began and operated a tanning salon business located at 339 Jackson Avenue, Syosset, New York called "Miami Tans."

3

18.	At that time, M.A. Ortiz led Reich to believe that M.A. Ortiz would assist him in developing, opening, and operating a personal training business located near or adjacent to Miami Tans to be called "Miami Fitness NY."

19.	In support of that promise, M.A. Ortiz had his then-wife, M. Ortiz on or about May 1, 2009 create a blog posting that she was appointed by Reich and M.A. Ortiz as the "new Interactive E-Commerce Marketing Head Analyst and Strategist of SEO, SEM, and SMO" for Miami Tans. The web address for that blog was http://melissaortiz-seo.blogspot.com/2009/05/what-has-melissa-ortiz-done-for-miami.html. That blog posting identifies the MiamiTans business as jointly owned and operated by Reich and M.A. Ortiz. Reich did not draft, edit, or otherwise contribute to the creation, editing, or displaying of that posting.

20.	Based on M.A. Ortiz and M. Ortiz's promises to assist Reich in opening "Miami Fitness NY," Reich incurred additional costs and expenses associated with opening "Miami Fitness NY."

21.	Ultimately, neither M.A. Ortiz nor M. Ortiz provided the promised assistance to Reich and, as a consequence, Reich did not open the "Miami Fitness NY" business and Reich lost his financial investment.

*Ortiz's Application for the SEO Position and her Related Material Misrepresentations*

22.	In response to the Driven Companies' solicitation of potential candidates for the SEO Director position, M. Ortiz provided her resume to the Driven Companies in or around March 2012.

23.	M. Ortiz's resume contained a number of representations of material facts regarding her employment history. Those written representations were reasonably calculated by

4

M. Ortiz to deceive the Driven Companies into believing that she had substantial and superior experience in the SEO field. M. Ortiz made those written representations with the specific intent to deceive the Driven Companies into believing that she was an expert in SEO so that the Driven Companies would hire her and place her in a position of trust within the Driven Companies. M. Ortiz's written representations in her resume did, in fact, deceive the Driven Companies into believing that she was an SEO expert and providing her with a position of trust within the companies.

24.     In her resume, M. Ortiz identified a number of positions she held for prior employers and the salary paid while holding those positions. Specifically, she identified the following prior employers and positions held: On-line Media Director for CGR Creative in Charlotte, North Carolina; Global Director of E-Commerce for Henry Schein Pharmaceuticals; Vice President for Cablevision/Newsday; and Vice-President of Interactive Marketing for First Class Equities.

25.     After M. Ortiz's employment ended, the Driven Companies first began to discover that M. Ortiz and Abomb were not as represented to them. As such, the Driven Companies began an investigation.

26.     That investigation revealed that many of M. Ortiz's written representations were false. Specifically, M. Ortiz misrepresented, at a minimum, the amount of her compensation received while employed by CGR Creative and Henry Schein Pharmaceuticals. She also misrepresented her title while employed by Cablevision/Newsday as she was employed as a manager and not a Vice President. Also, she failed to inform the Driven Companies that the President, former owner, and company for whom she allegedly served as the Vice President of

Interactive Marketing were indicted and pled guilty to creating and maintaining a scheme to defraud various banks and entities for approximately $58 million in mortgage loans.

27.     In her resume, M. Ortiz also stated that she received Masters Degrees in English and Business from the State University of New York at Stony Brook.  Subsequent investigation revealed, however, that M. Ortiz did not receive Masters Degrees in English and Business.  She instead received a Masters of Arts from the State University of New York at Stony Brook.

28.     In her resume, M. Ortiz also included information designed to induce the Driven Companies to conclude that she was an expert in the SEO industry.  For example, she stated that she: authored the cover stories for the May 2009 and July 2009 issues of *Search Engine Strategies Magazine*; served as a featured speaker at the 2010 MACTECH conference; and served or was asked to serve as a key note speaker at two industry conferences.

29.     Subsequent investigation revealed, however, that she did not publish cover stories for *Search Engine Strategies Magazine* nor did she serve as a feature or key note speaker at the identified industry conferences.

*30.*     Prior to discovering these misrepresentations, the Driven Companies – substantially based on these misrepresentations – hired M. Ortiz to serve as their SEO Director on or around March 19, 2012.

*Defendants' Conspiracy to Defraud the Driven Companies*

31.     In the course and scope of her job duties, M. Ortiz was asked to identify, solicit proposals, evaluate, and select a service provider from at least three different candidates to provide SEO services for the Driven Companies (the "SEO Contract").

32.     However, rather than do as asked and hire a legitimate third-party provider of SEO services, M. Ortiz, together with M.A. Ortiz, instead formulated and implemented a plan to

6

defraud the Driven Companies by causing them to unknowingly pay money intended for a legitimate SEO provider to her instead.

33. In furtherance of that scheme to defraud, M.A. Ortiz contacted Reich and offered to make amends for his failure to carry out his and M. Ortiz's promise to help Reich develop and open "Miami Fitness NY" by providing him with an opportunity to earn significant money. M.A. Ortiz explained to Reich that M. Ortiz wanted to, in essence, hire herself to perform SEO services for the Driven Companies. He further explained that they needed Reich to create a straw company that M. Ortiz could hold out to the Driven Companies as the legitimate, third-party SEO company she identified and hired to perform those SEO services. In exchange for creating a straw company in his name, M.A. Ortiz and M. Ortiz would pay Reich a portion of the money received from the Driven Companies for his participation.

34. Reich agreed to participate in the Ortizes' conspiracy.

35. Because they knew that the Driven Companies would not knowingly hire M. Ortiz or M.A. Ortiz to provide SEO services, Defendants agreed to and implemented a three step plan to defraud the Driven Companies.

*Step One – Forming the Straw Company and Making it Appear Legitimate*

36. In the first step of the scheme, M. Ortiz and/or M.A. Ortiz formed and created Abomb on Reich's behalf. The Ortizes took all necessary action and conduct to create Abomb for Reich as Reich did nothing to form or create Abomb other than to pay for its creation as described below.

37. M. Ortiz and M.A. Ortiz intended for Abomb to serve as the straw company that would be awarded the Driven Companies' contracts for providing SEO services.

7

38.     Despite the fact that Abomb was a straw company without operations, M. Ortiz and/or M.A. Ortiz created a website whose intent was to make Abomb appear as though it was a legitimate company engaged in the provision of SEO services.   M. Ortiz and/or M.A. Ortiz specifically tailored Abomb's webpage to appeal to the Driven Companies by ensuring that the terms "SEO Charlotte" and "TOP SEO New York based agency" are associated with Abomb's website.

39.     Reich provided M. Ortiz with his debit card information, which she and/or M.A. Ortiz used in the course of creating the Abomb to make it appear as if Reich formed the company himself.

40.     Finally, M. Ortiz established Abomb email accounts for her, M.A. Ortiz, and Reich and provided the relevant login information to M.A. Ortiz.  M. Ortiz subsequently used that email account to send herself emails to her email account at the Driven Companies, such that it appeared that she was engaging in legitimate communications with Reich and Abomb.

41.     M.A. Ortiz participated in Abomb under the pseudonym of "Michael Davis" or "Michael Miller" (M.A. Ortiz will herein be referred to as "M.A. Ortiz" regardless of whether he was operating under a pseudonym at the time of any particular fact alleged).  On information and belief, M.A. Ortiz adopted those pseudonyms in an effort to prevent the Driven Companies from discovering M. Ortiz's involvement with Abomb.  He also created an email address under the Abomb email account that reflected his "Michael Davis" pseudonym.

42.     The Defendants were fully aware at all times that both Reich and M.A. Ortiz lacked the necessary knowledge or training to provide SEO services.

*Step Two – Creating a Fake Bid for SEO Services*

43.　　In the second step of the fraud, M. Ortiz did not identify and solicit proposals from at least three different candidates to provide SEO services for the Driven Companies as instructed.

44.　　Instead, M. Ortiz contacted only one SEO service provider - Bruce Clay, Inc. ("BCI").  BCI is widely recognized and regarded as one of the premier SEO service providers in the world.  BCI provides, among other services, SEO and internet marketing support to global companies such as AT&T, Toyota, and eBay.

45.　　M. Ortiz contacted BCI on or about April 5, 2012 and requested that BCI prepare and forward to Ortiz a detailed proposal, including a scope of work and contract proposal for the provision of SEO services to both Meineke and EconoLube (collectively, the "Initial BCI Proposals").

46.　　M. Ortiz contacted no other potential SEO provider.

47.　　On or around April 10, 2012, BCI forwarded the Initial BCI Proposals for Meineke to M. Ortiz.  After reviewing the Initial BCI Proposals submitted, M. Ortiz contacted BCI later in the day of April 10, 2012 and advised BCI that changes were necessary to meet the Driven Companies' needs.

48.　　At 1:48 p.m. and 3:29 p.m. EDT on April 26, 2012, and to meet M. Ortiz's demands, BCI forwarded the revised and final scope of work and contract proposal for the provision of SEO services to both Meineke and EconoLube (collectively, the "Revised BCI Proposals").

49.　　But, rather than submitting the Revised BCI Proposals for consideration for the SEO Contract, at 3:33 p.m. and 3:36 p.m. EDT on April 26, 2012, M. Ortiz forwarded copies of

9

the Revised BCI Proposals from her work email account to her personal email account at melissa.strategist@gmail.com (M. Ortiz's "Personal Email").  Upon information and belief, she then forwarded the Revised BCI proposals from her Personal Email to Abomb's email account.

50. At 3:38 p.m. EDT on April 26, 2012, M. Ortiz responded to BCI to acknowledge receipt of the Revised BCI Proposals.

51. At 3:43 p.m. EDT on April 26, 2012, M. Ortiz forwarded a substantial majority of the Driven Companies' internal and confidential information regarding the SEO and other relevant optimization tools for their websites from her work computer to her Personal Email.

52. Upon information and belief, at 3:59 p.m. EDT on April 26, 2012, M. Ortiz participated in a 54 minute 39 second conference call with her co-conspirators to discuss the final implementation of their fraud.

53. M. Ortiz or M.A. Ortiz then used the Revised BCI Proposals to generate a submission for SEO services reflecting Abomb's name.  In so doing, Defendants plagiarized a substantial majority of the contract and terms and conditions documents of the BCI Proposals, including those documents' identifying footers contained at the bottom of each page, and re-formatted those documents for use by Abomb (the "Abomb Contracts").

54. In short, within days, M. Ortiz made it appear as though Reich and M.A. Ortiz – holding himself out as "Michael Davis" – were associated with a legitimate, established SEO services company, despite the fact that neither of them had any prior SEO experience.

55. In an effort to provide Abomb with an air of legitimacy, M. Ortiz, under the identity of Abomb and Reich and/or M.A. Ortiz – holding himself out as "Michael Davis" – also created a proposal for the provision of SEO services to EconoLube for submission to M. Ortiz at Driven Companies (the "Abomb Proposal").  The substance of the Abomb Proposal was likewise

plagiarized from the relevant BCI Proposals and from various public sources available on the internet, including from the following websites, among other locations: http://toughtalkradionetwork.com/become-a-thought-leader-in-your-industry/; http://www.teleteria.com/search_engine_advertise.html; and http://www.cameleoni.com/onlinemarketing.htm.

*Step Three – Selecting Abomb as the SEO Service Provider*

56. In the third and final step of the scheme, M. Ortiz abused the trust granted to her through her SEO Director position to "select" Abomb as the outside vendor and cause the Driven Companies to enter "contracts" with Abomb.

57. On or about April 29, 2012 and thereafter, M. Ortiz used and presented the Abomb Proposal, in addition to Abomb's website and M. Ortiz's oral representations to the Driven Companies' executives, to deceive the Driven Companies into believing that Abomb was a legitimately operating and leading national SEO service provider with a tremendous amount of experience in the area. In truth, none of it is or was accurate.

58. On April 30, 2012 at 12:06 a.m., M. Ortiz, under the email address for Abomb, forwarded the plagiarized Abomb Contract and Abomb Proposal for EconoLube to herself for her own review and edit.

59. Between April 29, 2012 and May 5, 2012, M. Ortiz reviewed and edited the Abomb Contract for EconoLube forwarded from Abomb's email address on April 29, 2012 and provided those edits to M.A. Ortiz and/or Reich (the "Ortiz Edits"). The Ortiz Edits are not modifications that benefit the Driven Companies, however. Rather, those edits contain changes either favorable to Abomb or simply stylistic in nature. As an example, the Ortiz Edits reduce

11

the number of reports detailing Abomb's alleged efforts under the agreements from two per month to one.

60. On Saturday, May 5, 2012 at 9:32 p.m., M. Ortiz used Reich's Abomb email address to forward to herself the Abomb Contract for EconoLube revised to incorporate the Ortiz Edits.

61. Between Saturday evening, May 5, 2012 and Sunday, May 6, 2012, M. Ortiz approved the revised Abomb Contract for EconoLube containing the Ortiz Edits and communicated, with herself through the Abomb email address, that approval. M. Ortiz made it appear as though Reich incorporated the Ortiz Edits into the plagiarized Abomb Contract for Meineke.

62. On Sunday, May 6, 2012 at 6:22 p.m., M. Ortiz, through Reich's Abomb email address, forwarded the plagiarized Abomb Contracts for both of the Driven Companies revised to contain the Ortiz Edits to herself for execution. In this email communication, M. Ortiz made it appear as though Reich was drafting and sending the email. It states, "[p]lease see both contracts attached with your changes implemented on both . . ."

63. Immediately upon receipt, M. Ortiz "approved" the plagiarized Abomb Contracts on behalf of the Driven Companies and signed those contracts.

64. The plagiarized Abomb Contract for Meineke provided for a total of $485,000.00 in payments to Abomb over a two year period for SEO services despite the fact that no one affiliated with Abomb - other than M. Ortiz – has any experience in the SEO industry.

65. The plagiarized Abomb Contract for EconoLube provides for a total of $252,000.00 in payments to Abomb over a three year period for SEO services despite the fact that no one affiliated with Abomb - other than M. Ortiz - has any experience in the SEO industry.

12

66.     M. Ortiz relied upon her position with the Driven Companies, as well as the relationship of trust and confidence between herself and the Driven Companies, to approve Abomb as the vendor for SEO services and their plagiarized Abomb Contracts.  She then executed the Abomb Contracts on behalf of the Driven Companies on May 7, 2012.

*The Payoff*

67.     On May 7, 2012, M. Ortiz immediately requested that Meineke pre-pay Abomb the entire first year of fees due under Meineke's purported agreement with Abomb in the total amount of $250,000.00 despite that such a request is well outside of the industry's standard.  M. Ortiz also requested that EconoLube pre-pay the first two months of fees under EconoLube's purported agreement with Abomb in the total amount of $14,000.00. At that time, the Driven Companies requested that Abomb provide a W-9.

68.     Abomb provided its W-9 as requested.  The tax identification number provided on the W-9, however, was the Social Security Number of a long ago deceased Texas man.

69.     In response to M. Ortiz's request for payment to Abomb, the Driven Companies authorized payment of $150,000.00 from Meineke and $14,000.00 from EconoLube.

70.     On May 18, 2012, Meineke issued and forwarded check number 22875 in the amount of $150,000.00 to Abomb (the "Meineke Payment").

71.     On May 18, 2012, EconoLube issued and forwarded check number 59674 in the amount of $14,000.00 to Abomb (the "First EconoLube Payment").

72.     Abomb Received the Meineke Payment on or about May 25, 2012.  Immediately upon receipt, Reich deposited the checks into an account he formed for Abomb for the purpose of, among other things, accepting payments from the Driven Companies and sharing those proceeds with M. Ortiz and M.A. Ortiz.

13

73. On May 25, 2012, Reich also contacted M. Ortiz and M.A. Ortiz to advise them of his receipt of the Meineke Payment. At that time, M. Ortiz and/or M.A. Ortiz directed Reich, once the funds became available, to keep $37,500.00 of the Meineke Payment for himself and his participation in the scheme to defraud and to forward the remainder of the Meineke payment from Abomb to a company M.A. Ortiz previously formed and created, Grant Haze Agency, LLC ("GHA"), for the purpose of concealing the fact that M. Ortiz and/or M.A. Ortiz were receiving money from the Meineke Payment.

74. The funds from the Meineke Payment became available on or about May 29, 2012. On that date, Reich drafted check number one from the checking account he opened on behalf of Abomb in the amount of one hundred twelve thousand five hundred dollars in favor of GHA and forwarded that check to M. Ortiz and/or M.A. Ortiz (the "First Check"). M. Ortiz and/or M.A. Ortiz received the First Check on or about May 31, 2012 and presented it for deposit at the bank at which they established an account for GHA.

75. Abomb also received the EconoLube Payment on or about May 29, 2012. Immediately upon receipt, Reich contacted M. Ortiz and M.A. Ortiz to advise them of his receipt of the EconoLube Payment. At that time, M. Ortiz and/or M.A. Ortiz directed Reich to forward twelve thousand of the fourteen thousand of those funds to GHA once those funds became available.

76. The funds from the EconoLube Payment became available on or about May 29, 2012. On that date, Reich drafted check number two from the checking account he opened on behalf of Abomb in the amount of twelve thousand dollars in favor of GHA and forwarded that check to M. Ortiz and M.A. Ortiz (the "Second Check"). M. Ortiz and/or M.A. Ortiz received

14

the Second Check on or about May 31, 2012 and and presented it for deposit at the bank at which they established an account for GHA.

77. Over the summer of 2012, M. Ortiz contacted Reich to advise Reich that EconoLube would be sending a third check for services to Abomb.

78. On or about August 16, 2012, Abomb received a check from EconoLube in the amount of seven thousand dollars (the "Second EconoLube Payment"). Upon receipt, Reich contacted M. Ortiz to confirm receipt of the Second EconoLube Payment. At that time, M. Ortiz advised Reich that she and M.A. Ortiz were getting a divorce and that he could retain one thousand dollars for his participation and he should send GHA a check for three thousand dollars for M.A. Ortiz's participation and her a check for three thousand dollars for her participation.

79. On August 16, 2012, Reich drafted check number 1735600414 from the checking account he opened on behalf of Abomb in the amount of three thousand dollars in favor of GHA and forwarded that check to M.A. Ortiz (the "Third Check"). M.A. Ortiz received the Third Check on or about August 21, 2012 and presented it for deposit at the bank at which he established an account for GHA.

80. On August 16, 2012, Reich drafted check number 1735600411 from the checking account he opened on behalf of Abomb in the amount of three thousand dollars in favor of M. Ortiz and forwarded that check to M. Ortiz (the "Fourth Check"). M. Ortiz received the Fourth Check on or about August 27, 2012 and presented it for deposit at her bank.

81. At no time did M. Ortiz, M.A. Ortiz, or GHA provide services of any kind, including SEO services, to, for, or on behalf of Abomb.

15

82.     In an effort to conceal the fraud, M. Ortiz and her co-conspirators engaged in a number of activities designed to give the appearance of legitimacy to Abomb.  Furthermore, M. Ortiz limited contact between Abomb and/or her co-conspirators and other employees of Driven Brands.

83.     As an example, SEO services agreements with the scope of the purported Abomb Contracts typically include a significant amount of training and direct, in-person consultation between the service provider and the customer, as the Revised BCI Proposals included. The Abomb Contracts, however, exclude such training and consultation.

84.     In addition, M. Ortiz took great lengths to ensure she was the sole point of contact between Abomb and the Driven Companies at all material times.  To that end, she specifically instructed the Driven Companies' information technology and marketing personnel to not contact or provide typical and routine information to Abomb despite that such contact and information was necessary for an SEO service provider to perform typical services.

85.     M. Ortiz also personally used the Driven Companies' log-in and password credentials for two third-party SEO monitoring services, Google Analytics and SEOmoz to make it appear Abomb was performing services for the Driven Companies.  In essence, Google Analytics and SEOmoz provide domain and website owners with certain basic analytical tools and information that permit the domain and website owner to monitor how consumers are interacting with their domains and websites.  They also provide the domain and website owners with standard and customizable reports summarizing that information.

86.     Despite the fact that legitimate SEO service providers traditionally provide customers with customized detailed written reports identifying the substantial amount of effort

undertaken to improve and optimize a customer's domain and/or websites, M. Ortiz and/or M.A. Ortiz simply printed the standardized "welcome dashboard" on the front page of Google Analytics and forwarded that "report" to M. Ortiz at the Driven Companies each month as evidence of their required SEO efforts. These "reports" also failed to comply with Abomb's obligations under the purported Abomb Contracts. Nonetheless, M. Ortiz "authorized" and caused the Second EconoLube Payment to be paid to Abomb for the "work" performed for EconoLube.

87. M. Ortiz took this basic information available through Google Analytics and other information provided through the SEOmoz service and "summarized" it in correspondence and in meetings to the Driven Companies' presidents and other personnel as evidence of the work product provided by Abomb.

88. In addition, it is necessary for an SEO service provider to access the computer server that hosts the domains and/or websites to perform basic, fundamental SEO services. Neither Abomb nor any of its principals ever accessed the Driven Companies' servers to perform such tasks, however.

89. From the signing of the Abomb Contracts to date, Abomb, Reich, M. Ortiz, and/or M.A. Ortiz failed to engage in or otherwise provide legitimate SEO services to the Driven Companies.

*Abomb and GHA are simply alter-ego's of the Individual Defendants*

90. Reich is the sole member, officer, and director of Abomb.

91. At a minimum, Reich, M. Ortiz, and M.A. Ortiz are and were, at all material times, solely and wholly responsible for the operation and operational decisions, including those relating to finances, of Abomb.

17

92.     Reich and/or the Ortizes independently and wholly dominated and controlled Abomb such that Abomb does not enjoy an independent existence.

93.     Abomb has and continues to fail to observe the corporate formalities required by law and observed by legitimately operating limited liability companies.

94.     Abomb is and was used for an improper purpose and as a mere instrumentality of Reich and the Ortizes as an artifice of fraud.  Abomb's sole intent and purpose is to delay, hinder, and defraud third-parties, including the Driven Companies.

95.     Abomb made payments to and on behalf of Reich, GHA, and the Ortizes despite not having received reasonably equivalent value in exchange for those transfers.

96.     M.A. Ortiz is the sole member, officer, and director of GHA.

97.     M. Ortiz, and M.A. Ortiz are and were, at all material times, solely and wholly responsible for the operation and operational decisions, including those relating to finances, of GHA.

98.     M. Ortiz and/or M.A. Ortiz independently and wholly dominated and controlled GHA such that GHA does not enjoy an independent existence.

99.     GHA has and continues to fail to observe the corporate formalities required by law and observed by legitimately operating limited liability companies.

100.    GHA is and was used for an improper purpose and as a mere instrumentality of M. Ortiz and/or M.A. Ortiz as an artifice of fraud.

101.    GHA's sole intent and purpose is to delay, hinder, and defraud third-parties, including the Driven Companies.

102.    GHA made payments to and on behalf of M. Ortiz and/or M.A. Ortiz despite not having received reasonably equivalent value in exchange for those transfers.

18

## COUNT I
## MEINEKE'S CLAIM OF CONSTRUCTIVE FRAUD AGAINST ALL DEFENDANTS

103. Meineke hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

104. As set forth in detail above, M. Ortiz made numerous false representations and/or concealed material facts from Meineke regarding her professional experience and abilities in SEO.

105. As also set forth in detail above, Abomb and Reich knowingly permitted M. Ortiz and/or M.A. Ortiz to make numerous false representations and/or conceal material facts from Meineke regarding their background and SEO experience and capabilities.

106. Defendants reasonably calculated that these false representations and/or concealed material facts would deceive Meineke into believing that Abomb, Reich, and M.A. Ortiz were qualified to serve as Meineke's third-party SEO provider.

107. Defendants made these false representations and/or concealed material facts with the intent to deceive Meineke into believing that Abomb, Reich, and M.A. Ortiz were qualified to serve as Meineke's third-party SEO provider and thereby gain a lucrative contract that was not reflective of the value or services such an agreement would typically provide Meineke.

108. Defendants' false representations and/or concealed material facts did, in fact, deceive Meineke and directly and proximately caused damages to Meineke.

109. Defendants also utilized M. Ortiz's relationship of trust and confidence with Meineke to consummate a transaction to cause damage to Meineke.

WHEREFORE, Meineke Car Care Centers, Inc. hereby prays that this Honorable Court enter a judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial, plus all allowable and taxable costs permitted by law and all such other

19

relief as this Honorable Court deems just and proper.

**COUNT II**
**ECONOLUBE'S CLAIM OF CONSTRUCTIVE FRAUD AGAINST ALL DEFENDANTS**

110. EconoLube hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

111. As set forth in detail above, M. Ortiz made numerous false representations and/or conceal material facts from EconoLube regarding her professional experience and abilities in SEO.

112. As also set forth in detail above, Abomb and Reich knowingly permitted M. Ortiz and/or M.A. Ortiz to make numerous false representations and/or concealed material facts from EconoLube regarding their background and SEO experience and capabilities.

113. Defendants reasonably calculated that these false representations and/or concealed material facts would deceive EconoLube into believing that Abomb, Reich, and M.A. Ortiz were qualified to serve as EconoLube's third-party SEO provider.

114. Defendants made these false representations and/or concealed material facts with the intent to deceive EconoLube into believing that Abomb, Reich, and M.A. Ortiz were qualified to serve as EconoLube's third-party SEO provider and thereby gain a lucrative contract that was not reflective of the value or services such an agreement would typically provide EconoLube.

115. Defendants' false representations and/or concealed material facts did, in fact, deceive EconoLube and directly and proximately caused damages to EconoLube.

116. Defendants also utilized M. Ortiz's relationship of trust and confidence with EconoLube to consummate a transaction to cause damage to EconoLube.

WHEREFORE, Econo Lube N' Tune, Inc. hereby prays that this Honorable Court enter a

20

judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial, plus all allowable and taxable costs permitted by law and all such other relief as this Honorable Court deems just and proper.

## COUNT III
### VIOLATION OF NORTH CAROLINA'S DECEPTIVE AND UNFAIR
### TRADE PRACTICES ACT BY MEINEKE AGAINST ALL DEFENDANTS

117.    Meineke hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

118.    Defendants' effort to defraud Meineke is an unfair and/or deceptive act or practice that is in or affects commerce as defined and prohibited by the Act.

119.    Defendants' efforts to defraud Meineke did, in fact, directly and proximately cause damage to Meineke in an amount equal to at least $150,000.00.

120.    Pursuant to the Act, Meineke's actual damages are trebled.

121.    Pursuant to the Act, Meineke may be entitled to its reasonable attorneys' fees because Defendants: (i) willfully engaged in the acts and practices complained of; and (ii) unwarrantedly refused to fully resolve this matter pre-suit.

122.    Meineke has engaged undersigned counsel and agreed to pay counsel a reasonable attorneys' fee for all services rendered relating to this action and otherwise in connection with enforcing its rights.

WHEREFORE, Meineke Car Care Centers, Inc. hereby prays that this Honorable Court enter a judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial and trebled pursuant to applicable statute, plus all allowable and taxable costs, including reasonable attorneys' fees per statute and as otherwise permitted by law, and all such other relief as this Honorable Court deems just and proper.

21

## VIOLATION OF NORTH CAROLINA'S DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT BY ECONOLUBE AGAINST ALL DEFENDANTS

123. EconoLube hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

124. Defendants' effort to defraud EconoLube is an unfair and/or deceptive act or practice that is in or affects commerce as defined and prohibited by the Act.

125. Defendants' efforts to defraud EconoLube did, in fact, directly and proximately cause damage to EconoLube in an amount equal to at least $21,000.00.

126. Pursuant to the Act, EconoLube's actual damages are trebled.

127. Pursuant to the Act, EconoLube may be entitled to its reasonable attorneys' fees because Defendants: (i) willfully engaged in the acts and practices complained of; and (ii) unwarrantedly refused to fully resolve this matter pre-suit.

128. EconoLube has engaged undersigned counsel and agreed to pay counsel a reasonable attorneys' fee for all services rendered relating to this action and otherwise in connection with enforcing its rights.

WHEREFORE, Econo Lube N' Tune, Inc. hereby prays that this Honorable Court enter a judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial and trebled pursuant to applicable statute, plus all allowable and taxable costs, including reasonable attorneys' fees per statute and as otherwise permitted by law, and all such other relief as this Honorable Court deems just and proper.

## COUNT V
## MEINEKE'S CLAIM FOR CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

129. Meineke hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

130.    Pursuant to a common scheme, Defendants entered into an agreement to do a lawful act by actually and constructively defrauding Meineke.

131.    Defendants' conduct directly and proximately caused injury in the form of money damages to Meineke.

WHEREFORE, Meineke Car Care Centers, Inc. hereby prays that this Honorable Court enter a judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial, plus all allowable and taxable costs permitted by law and all such other relief as this Honorable Court deems just and proper.

## COUNT VI
## ECONOLUBE'S CLAIM FOR CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

132.    EconoLube hereby reincorporates and re-alleges paragraphs one through 102 above as if fully set forth herein.

133.    Pursuant to a common scheme, Defendants entered into an agreement to do a lawful act by actually and constructively defrauding EconoLube.

134.    Defendants' conduct directly and proximately caused injury in the form of money damages to EconoLube.

23

WHEREFORE, Econo Lube N' Tune, Inc. hereby prays that this Honorable Court enter a judgment against Defendants, jointly and severally, for money damages in an amount to be determined at trial, plus all allowable and taxable costs permitted by law and all such other relief as this Honorable Court deems just and proper.

This 5 day of June, 2013.

s/ David Tkach
David L. Tkach, Esq.
N.C. Bar No. 34252
dtkach@tkachlaw.com
David L. Tkach, PLLC
2020 S. Tryon Street, Suite 2A
Charlotte, North Carolina 28203

Wesley S. White, Esq.
N.C. Bar No. 43916
wes@weswhitelaw.com
Law Offices of Wesley S. White
2020 S. Tryon Street, Suite 2A
Charlotte, North Carolina 28203

*Co-Counsel (Pro Hac Vice)*

Dennis D. Leone, Esq.
Florida Bar No. 069401
dleone@shankmanleone.com
Shankman Leone, P.A.
609 E. Jackson Street, Suite 100
Tampa, Florida 33602

*Attorneys for Meineke Car Care Centers, Inc. and Econo Lube N' Tune, Inc.*

Case 3:12-cv-00760-FDW-DSC    Document 25    Filed 06/05/13    Page 24 of 24